ARKANSAS STATE HIGHWAY COMMISSION
*v.* W. F. LEMLEY ET AL

73-1                                                  497 S.W. 2d 680

Opinion delivered June 25, 1973
[Rehearing denied August 27, 1973.]

*Thomas B. Keys* and *James N. Dowell,* for appellant.

*Gordon & Gordon* and *Williams & Gardner,* for appellees.

J. FRED JONES, Justice. This is the fourth appeal of this case brought by the Arkansas State Highway Commission from judgments rendered in the Conway County Circuit Court in favor of W. F. Lemley, et al, growing out of condemnation proceedings brought by the Highway Commission in connection with the condemnation of rights-of-way for Interstate 40 through Conway County.

The appellees, Lemley and Jackson, owned 160 acres of land consisting of three contiguous 40's running north and south in Section 33 and a separate 40 acres in Section 34 lying east of the north 40 in Section 33, but separated from the three 40's by an intervening 40 acres owned by a Mr. Robinson. As pointed out on the first appeal reported in 247 Ark. 201, 444 S.W. 2d 692, the Interstate 40 taking crossed the land in Section 33 from the southeast to the northwest leaving 40.8 acres south of the Interstate and 60.48 acres north of the Interstate. The 40.8 acres remaining south of the Interstate had highway frontage on a blacktop highway as before the taking, but the 60.48 acres north of the Interstate was left without public highway access. The north 40 in Section 33 is timberland and the 40 acre tract in Section 34 is also timberland. The first case was tried on the theory that the entire tract, including the 40 acres in Section 34, constituted a unit of use for agricultural purposes with access to the 40 acre tract in Section 34 being provided by an easement between the north 40 in Section 33 and the 40 acres in Section 34 over the intervening 40 belonging to Robinson. The trial court in that case submitted to the jury the issue of whether or not the lands in Section 33 and Section 34 constituted a unit in use and denied the Highway Com-

mission's requested instruction directing the jury to disregard any damage to land in Section 34. We held in that case that the evidence was woefully lacking in proof as to unity of use between the land in Section 33 and the 40 acres in Section 34. We held, however, that the trial court did not err in refusing to give the Highway Commission's requested instruction since there was evidence from which the jury might have found that Lemley and Jackson had access to their land in Section 34 by the easement mentioned in evidence and since it was conceded there was no other public ingress and egress to and from the property.

Considerable argument in the case at bar is directed to "the law of the case" but in 5 Am. Jur. 2d, § 755, entitled "Decision on question of fact," is found a statement as follows:

> "The general principle seems to be that the doctrine of the law of the case applies only to determinations of questions of law and not to questions of fact. It has been said that the doctrine of the law of the case applies to all questions of law identical with those on the former appeal, and on the same facts and to the same questions only, that the doctrine is rarely, and in a very limited class of cases, applied to matters of evidence as distinguished from rulings of law, and that a decision on appeal on a question of fact does not generally become the law of the case, nor estop the parties on a second trial from showing the true state of facts."

At the first trial of this case judgment was entered on a jury verdict in the amount of $13,000 and we reversed because of erroneous instruction permitting the jury to take into consideration items not a part of the market value such as circuity of travel between the two tracts and the cost of acquiring new access. The pertinent portion of the erroneous instruction in that case was as follows:

> " 'What you are to determine in this case is what financial loss the defendants have sustained in this case by the taking of their lands; and if you do so find a *financial loss,* by a preponderance of the evidence, you are to return a verdict for just compensation for

this taking, in which verdict the indemnity must be real, substantial, and full.

Less would be unjust to the landowners; more would be unjust to the public.' " (Emphasis supplied by this court in the opinion).

On the second appearance of the case, 250 Ark. 186, 464 S.W. 2d 605, the jury verdict was for $12,000 and we reversed for error in the trial court's refusal to strike that portion of witness Barnes' testimony concerning the land valued as a unit. Mr. Barnes had arrived at a before value of $30,000 for the 120 acre tract and an after value of $18,000. He stated that he did not place a separate value on the 40.8 lying south and west of the Interstate in arriving at his after value. He considered it as one parcel before the taking and as one unit after the taking and on the whole 107.28 acres he ascribed damages in the amount of $170 per acre in round figures. In that opinion we said:

"We agree with appellant that the trial court should have struck that portion of Barnes' testimony relating to the damage to the remaining lands. Ordinarily noncontiguous lands cannot be valued as a unit. The exception is upon a showing of a unity of use. See *Kansas City So. Ry. Co.* v. *Boles,* 88 Ark. 533, 115 S.W. 375 (1908)."

On the third appeal to this court, 252 Ark. 549, 479 S.W. 2d 855, the jury awarded damages in the amount of $14,500 and we reversed because the trial court refused to strike a part of the testimony of Mr. Jackson, one of the owners who testified as such and also as an expert on land appraisals. Mr. Jackson testified on redirect examination, pertaining to comparable sales in an attempt to establish the market value of the land involved, that the City of Morrilton had paid him $400 an acre for some land for right-of-way purposes approximately 3/4 of a mile from the property in litigation. We held that this testimony was clearly contrary to the established rule which we reiterated to be as follows:

" 'The rule is firmly established that the price paid by a condemnor is inadmissible in establishing the

fair market value of other lands acquired in a condemnation proceeding. *Younts* v. *Public Service Co. of Ark.,* 179 Ark. 695, 17 S.W. 2d 886 (1929).' "

At the last trial of this case from which comes this appeal, the jury returned a verdict of $15,000 and judgment was entered thereon. Mr. Jackson, one of the owners, testified that just compensation amounted to $22,000 and his expert witness, C. V. Barnes, testified that just compensation should be in the amount of $13,000. W. E. Hayes and Charley Scott testified as experts for the Commission and they testified to just compensation in the amounts of $5,500 and $5,250 respectively.

The appellant designates 16 points upon which it relies for reversal but only argues 10 of them, the last five having to do with the expert testimony of C. V. Barnes. We feel that it would be a waste of judicial effort to comment on all the points raised by the appellant, many of which were considered on the prior appeals, but we conclude that we must again reverse this case because of the error assigned under appellant's point six as follows:

"The trial court erred in allowing Mr. Barnes to testify as to an income valuation of the property based upon his observation of the type soil on the property, his non-expert opinion of production projected from USDA county reports, capitalization of a hypothetical crop rent by a hypothetical investment yield."

Mr. Jackson, one of the owners, testified that prior to the taking the market value of both tracts of land was $40,000 and its highest and best use was for agricultural purposes. He valued the three 40's in Section 33 at $32,000 and the 40 acre tract in Section 34 at $8,000. He testified that after the taking the 120 acres in Section 33 was worth only $15,000 and the 40 acre tract in Section 34 was worth only $3,000, leaving a difference in value of both tracts at $22,000 as total damage and just compensation. He testified that the south 40 and part of the middle 40 in Section 33 had been cleared and part of the middle 40 had been planted in beans, but that the north 40 in Section 33

was in woodland as was the 40 acre tract in Section 34. He said no clearing had been done since the land was purchased in 1945. He placed a before taking value of $300 per acre on the south and middle 40's in Section 33 and $200 per acre on the north 40 in Section 33 and the 40 acre tract in Section 34. After the taking he valued that portion south of the Interstate at $200 per acre and that portion of the middle 40 north of the Interstate at $150 per acre. He said that the north 40 in Section 33 was only worth $75 per acre after the taking, and the 40 acre tract in Section 34 was reduced in value from $8,000 to $3,000. This valuation testimony to say the least is confusing.

In the second appeal of this case we said:

"Ordinarily noncontiguous lands cannot be valued as a unit. The exception is upon a showing of a unity of use. See *Kansas City So. Ry. Co.* v. *Boles,* 88 Ark. 533, 115 S.W. 375 (1908)."

It appears that this case was not tried the last time on the "unity of use" theory so it is rather difficult to understand how that portion of the property south of the Interstate, which still has the same access to highway frontage, has been reduced in value from $300 to $200 per acre. As to the property north of the Interstate, it is difficult to understand how the middle 40 could have been reduced to one-half its original value while the north timbered 40 in Section 33 is reduced to 37.5% of its original value, and the 40 acres of timberland in Section 34 is reduced to only 30.75% of its original value.

We find it unnecessary, however, to attempt to rationalize this testimony because we find it necessary to again reverse this case because of the highly speculative nature of expert witness Barnes' testimony in arriving at his conclusions as to the difference in the before and after market values of the lands involved. Mr. Barnes testified that in his opinion the fair market value of the contiguous 40's constituting the 120 acre tract in Section 33 prior to the taking was $30,000 and the fair market value of the 40 in Section 34 was $6,000. He said that after the taking the remaining 107.28 acres in Section 33 had a value of $18,200 and the 40 acre tract in Section 34 was

reduced in value to $4,800. He testified on direct examination that all the soil on the property in his opinion is suitable for row crops and specifically for soybeans. He said that the land north of the Interstate would be somewhat more productive than the sandy clay land on the southern part. He said he had had experience in estimating production and yield on soybean land and that he thinks this land was probably 30 bushel per acre land, and that he thinks one could get a little higher yield off the northern part of the property as compared to the extreme southern part. He said that the market price on soybeans at the time of the taking was about $2.50 per bushel.

On cross-examination Mr. Barnes testified that the land in Section 33 comprised one agricultural unit and that his before taking value on this property was based on an agricultural unit, owner occupied. He said the 40 acres in Section 34 was entirely in woods and the North 40 acres in the 120 acre tract was entirely in woods and that it had been that way ever since it was purchased back in 1945. He said that the highest and best use would be to clear the north 40 of the 120 and the other separate 40 in Section 34 and devote it all to agricultural use. Mr. Barnes testified that he kept a "black book" on land sales in the area; that it contained information on approximately 50 sales of land in the area and that he based his value opinion, partially on a study of all of these 50 transactions. He said he came across some strictly wooded land sales in the area and that he found such sales to be from $45 an acre up. He said he would have to refer to his map to be specific but thinks the woodland sales would range from $40 to $100 per acre.

Mr. Barnes was questioned on cross-examination concerning *specific* sales of similar land in the area (comparable sales) in arriving at his opinion as to the market value of the land involved. He again said he had market data on in excess 50 transactions that were made in the area and that he based his opinion on a study he made of the 50 transactions. He said that among the 50 transactions he found sales of woodlands ranging in value from $45 an acre to more than $100 per acre. He then testified as follows:

"Q. But specifically, what sales did you use Mr. Barnes?

A. I have told you that specifically the sales  I used was a study of all of the sales that are in this black book here which comprise about fifty sales.

Q. Well, did you find any sales of woodland in this particular area?

A. Well, now, you keep talking about woodland, but just remember we're not talking about a piece of land that's strictly woodland.

Q. The—

A. We're talking about land that has improvements on it, it's fenced and cross fenced, has been in cultivation, was in cultivation—

Q. You put $150.00 per acre on that forty acres in Section 34? Didn't you?

A. Yes, sir, I sure did.

Q. It's strictly woodland, isn't it?

A. In it's present use. It's not strictly woodland, because the highest and best use for it is doing with it what they've done on three sides of it, clear it up and put it in coltivation.

Q. That's all it's ever been used for, isn't it?

A. Sir?

Q. That's all it's ever been used for, isn't it?

A. I can't tell you, because; I've only been familiar with it about the last ten years. I don't know what the Indians did with it before that.

Q. You have no specific sales you can relate to me that you used as a basis for your woodland values, isn't this correct?

A. I cannot cite you a specific sale with respect to woodland only.''

Mr. Barnes then referred to one sale on the opposite side of Morrilton about six miles from the property involved in this case. He said part of it was hill land and part open land used for pasture, and that it sold for $290 per acre. He then testified that Mr. Carruthers paid $350 per acre for some land approximately two years after the date of taking. He said an overpass to the highway was east of the Carruthers property; that a road runs east of the property and directly into the overpass. Mr. Barnes indicated that his "black book" contained timberland sales data in the area where the market value was from $45 to better than $100, but Mr. Barnes simply avoided discussing comparability of any of the sales in his "black book" with the land involved in this case. Mr. Barnes continued his testimony as follows:

"Q. All right, sir. Now were there any other sales that you used as a basis for your value of $300.00 per acre value, other than the one that occurred some two years after the date of the taking?

A. Yes, sir. I used all fifty of these sales.

Q. You used all fifty of these sales?

A. Yes, sir.

Q. Now, particularly, which one do you think is most comparable to give you a value of $300.00 per acre on this property?

A. Well, this is—this 'more comparable' bit is something that I don't know where it came from—

Q. You don't know—

A. I think it's something that's been adopted—I don't know who adopted it, but the Bible that the appraisal industry uses, which is published by the American Institute of Real Estate Appraisers, doesn't talk about 'comparable sales' approach. They talk about 'market data' approach, and in analyzing market data, you analyzing market data, you analyze everything. . . ."

The record as to Mr. Barnes' testimony on redirect examination, which we conclude should have been stricken, appears as follows:

"Q. Mr. Barnes, do you have a slide rule with you?

A. Yes, sir.

Q. Do you try often times to justify your market data approach?

A. Yes, sir, one of the other approaches is what is known as the income approach.

MR. BROCK: We object. This is not proper rebuttal.

THE COURT: That may be true, but—

MR. BROCK: He went into that in chief, and I didn't touch on that on cross examination.

MR. GORDON: He questioned his appraisal.

MR. BROCK: Yes, sir, I—

THE COURT: I'm going to let him go into it.

MR. BROCK: Please note our exceptions.

BY MR. GORDON:

Q. Do you often justify your appraisal in your market data approach appraisal by other methods?

A. One approach is used to check your judgment on the other approach.

Q. Yes sir, Well, in this particular case you said in your opinion this land was soybean land and would produce thirty bushels to the acre; and on September 29, 1966, soybeans were bringing about $2.50 a bushel?

A. Yes, sir.

Q. How do you use that—Illustrate to the jury how you use that and come out with a figure a landowner could pay for a piece of property and get a reasonable return on his investment.

MR. BROCK: Your Honor, I would object to him answering that unless he's got a history and a basis for it.

THE COURT: Let's back up and get your history of the production and further qualify him.

MR. GORDON: That is my qualification. He testified that the land would produce thirty bushels to the acre, and that beans were selling for $2.50 a bushel in 1966. I want him to tell me what the purchaser could pay with that kind of land and get a reasonable return on his investment. What could he pay per acre?

THE COURT: Is that part of the testimony correct, Mr. Barnes?

A. Yes, sir.

THE COURT: Do you know with reference to the thirty bushels per acre and the $2.50 per bushel?

A. Judge, let me say this: I know that in 1966 the approximate range of soybean price was $2.50 per bushel. As to the specific productivity of the land itself, it's a matter of judgment, because even if I had, which I do not have, the historical production records of this farm, those are not indicative for appraisal purposes, because the productivity on any given farm is dependent to a great extent upon the person who farms it; and he might not have exercised good management practices; and, therefore, did not have a good yield, or he might have exercised better than average management practices and had a higher yield average. But based on my observation of the type soil that's out there and knowing from having investigated the United States Department of Agriculture reports on soybeans production in this county in 1966, I am of the opinion that this land,

under average conditions, could be expected to produce thirty bushels per acre.

THE COURT: All right. Go ahead.

MR. BROCK: Please note our exceptions.

BY MR. GORDON:

Q. Mr. Jackson testified that it did produce that on an overall basis?

A. Yes, sir. I believe that's correct.

Q. Now, would you go ahead and compute that for me, please sir?

A. Well, if you produce thirty bushel per acre, and soybeans are $2.50 a bushel, the gross yield per acre would be $75.00 per acre. Land in this county— let's assume that it's leased out. Land rent in this county is based on basically one-fourth crop rent. So, if you take one-fourth of $75.00, you come up with a figure, I think, of $18.75.

Q. Per acre?

A. Per acre, which would be the crop rent that was paid for the use of the land. And in 1966 6% was considered an adequate yield on investment in land, and if you capitalize that figure at 6%, you come out with $312.50 per acre."

The difference in the fair market values of the lands involved, immediately before and immediately after the taking, was all that was before the trial court and jury in this case. Mr. Barnes said that there were sales of timberland in the area for $45 to better than $100 per acre, yet he considers the north 40 timberland in Section 33 as well as the 40 timberland in Section 34 as an agricultural unit, and arrives at its before and after value as of the date of taking by assuming the land would produce 30 bushels of soybeans per acre which would sell for $2.50 per bushel, bringing a gross income of $75.00 per acre.

He then assumed a one-fourth crop rent of $18.75 capitalized at 6%, giving a result of $312.50 per acre.

Mr. Barnes did not seem to consider any of this land as timberland. He considered its market value from "the market data approach" as agricultural land, planted in soybeans with the rows running north and south. The north 40 in Section 33 and the 40 acres in Section 34 were not in cultivation on the date of taking and never had been. Both areas were in timber before the taking and remained in timber after the taking. Mr. Barnes did not mention the type of timber on the land or its market value. He refused to discuss any particular timberland sales in his "black book" but did use 30 bushel per acre beanland, with a market value of $2.50 per bushel on a one-fourth rental basis capitalized at 6% to reach the amount of $312.50 per acre one could afford to pay for land.

We are of the opinion that Mr. Barnes' testimony in this regard is entirely too speculative in fixing the before and after value of the lands here involved, and that this portion of his testimony should have been stricken.

Reversed and remanded.

BROWN, FOGLEMAN and HOLT, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. I find it necessary to dissent, for a second time, from a reversal of this case and from its fourth remand for a fifth trial to determine just compensation for a taking on September 29, 1966. The four verdicts by different juries have fixed the landowner's recovery at $13,000, $12,000, $14,500 and $15,000. See 247 Ark. 201, 444 S.W. 2d 692; 250 Ark. 186, 464 S.W. 2d 605; 252 Ark. 549, 479 S.W. 2d 855. We held on the first appeal that the testimony then before the court was insufficient to show a unity of use for farming purposes between the 120 acres in Section 33 and the 40 acres of timberland in Section 34. No effort has been made in this fourth trial to recover compensation based on treatment of the non-contiguous tracts as a unit. We recognized in Lemley I that there was evidence to present a jury question on the right to compensation for depri-

vation of access to the tract in Section 34. I submit that on the basis of the same evidence (and the evidence was not materially different) the existence of a jury question as to whether there were compensable damages for deprivation of access is the law of the case. *Bailey* v. *Stewart,* 238 Ark. 666, 385 S.W. 2d 20; *Ford Motor Company* v. *Fish,* 233 Ark. 634, 346 S.W. 2d 469, and cases cited therein.

In Lemley II this court ruled adversely to appellant on its points 3, 6 and 8, upon the basis that our holding on the first appeal had become the law of the case. They were:

3. The trial court erred in refusing to strike that portion of Mr. Jackson's testimony as to the east 40 acres of land on the basis that this is a separate tract of land; that there was no taking from this portion of land; and that any impairment of access to a separate tract would not be compensable.

6. The trial court erred in refusing to strike Mr. Barnes' testimony with respect to damages to the separate tract.

8. The trial court erred in giving appellees' requested instructions A and B.

Barnes' testimony as to damages to the 40-acre tract at the third trial is not materially different from that given by him on the second trial. Both times he valued the 40 acres at $4,800 before the taking and $1,200 after. This court found error only in Barnes' means of arriving at the value of remaining lands in the 120-acre tract. He did not use the disapproved means of valuing the residual tracts from the sundered 120-acre tract on this occasion. The reversal in the second appeal was not based in any respect on application of the language quoted in the majority opinion to testimony relating to the 40-acre tract. The only material difference in Barnes' testimony at the last trial was his reliance upon what he called the "market data" approach and his checking his opinion by an income approach based upon estimated soybean production.

The instructions complained of in Lemley II were those which submitted to the jury the questions whether the 40 acres were damaged by destruction or impairment of access, and if so, the amount of damage measured by the difference in value before and after the taking, giving consideration to the uses to which the land was put or for which it was reasonably suitable. It should be noted that this court also applied the law of the case on the second appeal in rejecting appellant's contention that the testimony of Judge Tom Scott, also a witness at the fourth trial, as to the cost of restoration of access should not have been admitted.

One premise of my present dissent is the same as I expressed in Lemley II. On that appeal, appellant challenged the action of the trial court in refusing to strike the landowner's before-the-taking value testimony and his resulting damage testimony, arguing that he gave no substantial evidence upon which to predicate his land values. Virtually the same attack is made on virtually the same testimony on this appeal. In the prior appeal, we found no merit in appellant's contention. Consequently, attempted rationalization of the testimony of Jackson is not only unnecessary, it is precluded. Furthermore, Jackson did not rely upon his sales to a potential condemnor, as he he did in Lemley III, as a basis of his value testimony. In my dissent in Lemley II, I pointed out that no infirmities were found in Jackson's testimony fixing the difference in value at $22,000 and that his testimony afforded support to the jury verdict without regard to Barnes' testimony, citing *Arkansas State Highway Commission v. Stallings*, 248 Ark. 1207, 455 S.W. 2d 874, and *Arkansas State Highway Commission v. Ormond*, 247 Ark. 867, 448 S.W. 2d 354. Even though we found the landowner's testimony in *Stallings* to be vulnerable to appellant's attack, we found the testimony of appellant's only other value witness afforded substantial evidentiary support for the jury verdict and affirmed the judgment. In *Ormond,* we held that the landowner's improper value testimony was manifestly not prejudicial when the verdict was substantially less than the assessment of damages for the taking made by the landowner's expert witness. We said that the error in not striking Ormond's testimony obviously did not enhance the award and that the verdict was less

than the amount for which there was substantial evidentiary support. The language we used in *Arkansas State Highway Commission* v. *Rowe*, 252 Ark. 59, 477 S.W. 2d 486, where the jury verdict was sustained by a unanimous court is so appropriate here that I take the liberty of quoting:

> We also have cases where the substantial nature of the testimony of a particular witness has been attacked, and we have agreed that the evidence complained of was not substantial, but we have then pointed out the testimony of other witnesses that did meet the test of substantiality, fully supported the verdict, and affirmed the judgment. Arkansas State Highway Commission v. Coffman et al., 247 Ark. 302, 445 S.W. 2d 92.

Here it seems obvious to me that Barnes' testimony fixing the amount of compensation at $13,000 did nothing to enhance the award of $15,000 and that Jackson's figure of $22,000 furnished ample evidentiary support for that verdict. Manifestly, any error in admitting, or failing to strike, Barnes' testimony was not prejudicial.

A further premise for my dissent is my disagreement with the majority as to the admissibility and substantiality of the Barnes testimony. I really don't understand how the majority can say that the matter upon which its opinion is based was argued by appellant. The only argument advanced by appellant is that comparable sales are indicators of value where there are no sales of identical property and that the opinion of this expert should be rejected because it was not substantiated. If the majority is basing its position on this argument, then it seems that its opinion must be construed as saying that the testimony of Barnes was not substantial or that it should have been stricken because it was not supported by testimony relating to comparable sales. If this is the case, then this jury verdict is a victim of the "comparable sale" syndrome which has stricken other verdicts. There are, and, I submit, will continue to be cases where there simply are no really comparable sales, and, of necessity, the opinion of a properly qualified expert must be admitted upon the basis of his familiarity with the prop-

erty involved, its highest and best use, the real estate market generally and any factors which might influence the hypothetical willing buyer and willing seller in negotiating a selling price. We have recently held that it is not always necessary that the opinion of a qualified real estate expert be supported by comparable sales to be admissible or to constitute substantial evidence, at least where comparable sales are not to be found, particularly when the lands involved are unimproved and unproductive. *Arkansas State Highway Commission* v. *Steen,* 253 Ark. 908, 489 S.W. 2d 781.

Barnes' qualifications are not questioned by appellant, who omitted abstracting his testimony on that score on the premise that they were well known to this court. Barnes described the tracts in detail enumerating advantageous features and pointed out the various factors which made them less desirable after the taking than before. He described the character of the soil and the topography and expressed the opinion that all the lands were suitable for row crops, specifically soybeans. He stated that even though the 40-acre tract was woodland, its highest and best use was agricultural and that any informed purchaser would so consider it. He testified that there was no specific sale to which he could attribute specific similarity as a basis for valuation of the woodland on both tracts, but that he referred to "market data" he had accumulated on at least fifty transactions in the vicinity, and arrived at his value by a study of them. They included some woodland sales ranging from $45 per acre to more than $100 per acre prices. He refused to classify these lands as woodland, however, because he considered their highest and best use to be for agricultural crops, as the land on three sides of the 40-acre tract was being used. According to Barnes, his "market data" approach is recognized by the American Institute of Real Estate Appraisers, and is to be used when there is no really comparable sale.

Barnes' income approach, condemned by the majority, was not the basis of his opinion at all. On redirect examination it was shown that this approach was used only as a check on his appraisal based on the market data approach. Barnes had previously testified, apparently

without objection, that the soil was capable of producing 30 bushels of soybeans per acre and that these beans were selling for $2.50 per bushel in 1966. Barnes himself acknowledged the weakness of this approach for appraisal purposes, but demonstrated that upon the basis of production of similar lands, income could be capitalized to show a value of $312.50 per acre. It stands to reason that a prospective purchaser would consider the factors mentioned by Barnes.

I humbly submit that the majority has not addressed itself to the arguments advanced on appeal, but has weighed the Barnes testimony rather than determining its admissibility or substantiality. Furthermore, it has not pointed out how appellant was prejudiced by the trial court's failure to strike this testimony, and the verdict certainly has eliminated the presumption we usually indulge.

In my opinion, we have two adequate and appropriate bases to end the reruns of this case by affirming the current judgment.

I am authorized to state that Mr. Justice Brown and Mr. Justice Holt join in this dissent.